**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES M. MUDD, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 10-1430** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge Lisa Pupo Lenihan** |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

### I.  Introduction

Plaintiff James M. Mudd, Jr. ("Mudd"), brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits under Title II of the Social Security Act ("Act") [42 U.S.C. § 401-433].  For the reasons that follow, the Commissioner's decision will be affirmed.

### II.  Procedural History

Mudd protectively applied for disability insurance benefits on February 7, 2007, alleging disability as of January 1, 2006.  R. at 108-113.  The application was administratively denied on July 3, 2007.  R. at 61.  Mudd responded on August 30, 2007, by filing a timely request for an administrative hearing.  R. at 65.  On December 18, 2008, a hearing was held in Johnstown, Pennsylvania, before Administrative Law Judge Patricia Henry (the "ALJ").  R. at 22.  Mudd, who was represented by counsel, appeared and testified at the hearing.  R. at 25-50.  Mark Heckman ("Heckman"), an impartial vocational expert, also testified at the hearing.  R. at 50-57.

1

In a decision dated January 27, 2009, the ALJ determined that Mudd was not "disabled" within the meaning of the Act.  R. at 8-21.  On February 2, 2009, Mudd sought administrative review of the ALJ's decision by filing a request for review with the Appeals Council.  R. at 6. The Appeals Council denied Mudd's request for review on August 31, 2010, thereby making the ALJ's decision the final decision of the Commissioner in this case.  R. at 1.  Mudd commenced this action on October 26, 2010, seeking judicial review of the Commissioner's decision.  ECF Nos. 1-3.  Mudd and the Commissioner filed motions for summary judgment on February 2, 2011, and March 4, 2011, respectively.  ECF Nos. 10 & 12.  In accordance with 28 U.S.C. § 636(c)(1), the parties have consented to have this matter adjudicated by a United States Magistrate Judge.  ECF Nos. 8 & 9.  The cross-motions for summary judgment filed by the parties are the subject of this memorandum opinion.

## III.   Standard of Review

This Court's review is plenary with respect to all questions of law.  *Schaudeck v. Commissioner of Social Security Administration*, 181 F.3d 429, 431 (3d Cir. 1999).  With respect to factual issues, judicial review is limited to determining whether the Commissioner's decision is "supported by substantial evidence."  42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994).  The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record.  *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191 (3d Cir. 1986).  Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541,

101 L.Ed.2d 490 (1988)(internal quotation marks omitted).  As long as the Commissioner's

decision is supported by substantial evidence, it cannot be set aside even if this Court "would

have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir.

1999).  "Overall, the substantial evidence standard is a deferential standard of review." *Jones v.

Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

    In order to establish a disability under the Act, a claimant must demonstrate a "medically

determinable basis for an impairment that prevents him [or her] from engaging in any

'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of

Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777

(3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant is considered to be

unable to engage in substantial gainful activity "only if his [or her] physical or mental

impairment or impairments are of such severity that he [or she] is not only unable to do his [or

her] previous work but cannot, considering his [or her] age, education, and work experience,

engage in any other kind of substantial gainful work which exists in the national economy." 42

U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

    To support his or her ultimate findings, an administrative law judge must do more than

simply state factual conclusions.  He or she must make specific findings of fact. *Stewart v.

Secretary of Health, Education & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983).  The administrative

law judge must consider all medical evidence contained in the record and provide adequate

explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d

955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

    The Social Security Administration ("SSA"), acting pursuant to its legislatively-delegated

rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose

of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court recently summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003)(footnotes omitted).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196.  The United States Court of Appeals for the Third Circuit has

recognized the applicability of this rule in the Social Security disability context.  *Fargnoli v.*

*Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001).  Thus, the Court's review is limited to the four

corners of the ALJ's decision.  *Cefalu v. Barnhart*, 387 F.Supp.2d 486, 491 (W.D.Pa. 2005).

## IV.   The ALJ's Decision

Mudd was insured for benefits under Title II only through December 31, 2006.  R. at 13,

126.  In his decision, the ALJ determined that Mudd had not engaged in substantial gainful

activity between his alleged onset date and the expiration of his insured status.  R. at 13.  Mudd

was found to be suffering from degenerative disc disease of the cervical and lumbar spine, mild

degenerative arthrosis of the interphalangeal joints, sleep apnea, a major depressive disorder

(recurrent), anxiety, polysubstance abuse (in remission), irritable bowel syndrome, hypertension

and mediastinal adenopathy.  R. at 13.  Although his irritable bowel syndrome, hypertension and

mediastinal adenopathy were deemed to be "non-severe," his remaining impairments were

deemed to be "severe" within the meaning of 20 C.F.R. §§ 404.1520(a)(4)(ii) and 404.1520(c).

R. at 13-14.  The ALJ concluded that these impairments did not meet or medically equal an

impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  R. at 14-15.

In accordance with 20 C.F.R. § 404.1545, the ALJ assessed Mudd's residual functional

capacity as follows:

> After careful consideration of the entire record, the undersigned finds that,
> through the date last insured, the claimant had the residual functional capacity to
> perform light work as defined in 20 C.F.R. 404.1567(b) except that he is limited
> to occasional postural maneuvers such as balancing, kneeling, stooping, crouching
> or climbing stairs or ramps, must avoid climbing ladders, ropes and scaffolds,
> must avoid overhead reaching, pushing and pulling with the upper extremities, is
> limited to simple, routine and repetitive tasks not performed in a fast paced
> production environment and involving only simple work related decisions and in
> general, relatively few workplace changes, is limited to occasional interaction
> with supervisors, coworkers and members of the general public.

R. at 15.  Mudd had past "relevant work experience"[1] as a retail sales clerk and store manager.

R. at 19, 137.  Heckman classified those jobs as "semi-skilled"[2] and "skilled"[3] positions at the

"light"[4] level of exertion.  R. at 51.  In response to a hypothetical question describing an

individual with Mudd's limitations, Heckman testified that such an individual could not work as

a retail sales clerk or store manager, since individuals maintaining those positions were

frequently required to interact with others.  R. at 51-52.  Consequently, the ALJ determined that

Mudd could not return to his past relevant work.  R. at 19.

Mudd was born on July 13, 1956, making him forty-nine years old on his alleged onset

date and fifty years old on the last day of his insured status.  R. at 19, 113, 126.  As of his alleged

onset date, Mudd was classified as a "younger person" under the Commissioner's regulations.

20 C.F.R. § 404.1563(c).  He became a "person closely approaching advanced age" on July 13,

2006.  20 C.F.R. § 404.1563(d).  He had the equivalent of a high school education[5] and an ability

---

[1] "Past relevant work" is defined as "substantial gainful activity" performed by a claimant within the last fifteen years that lasted long enough for him or her to learn how to do it.  20 C.F.R. § 404.1560(b)(1).  The Commissioner has promulgated comprehensive regulations governing the determination as to whether a claimant's work activity constitutes "substantial gainful activity."  20 C.F.R. §§ 404.1571-404.1576.

[2] "Semi-skilled work is work which needs some skills but does not require doing the more complex work duties. Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work.  A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks."  20 C.F.R. § 404.1568(b).

[3] "Skilled work requires qualifications in which a person uses judgment to determine the machine and manual operations to be performed in order to obtain the proper form, quality, or quantity of material to be produced. Skilled work may require laying out work, estimating quality, determining the suitability and needed quantities of materials, making precise measurements, reading blueprints or other specifications, or making necessary computations or mechanical adjustments to control or regulate the work.  Other skilled jobs may require dealing with people, facts, or figures or abstract ideas at a high level of complexity."  20 C.F.R. § 404.1568(c).

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities."  20 C.F.R. § 404.1567(b).

[5] The record indicates that Mudd dropped out of Peabody High School before completing the twelfth grade and later obtained a General Equivalency Diploma ("GED").  R. at 135, 248.

to communicate in English.  R. at 19, 26, 129; 20 C.F.R. § 404.1564(b)(4)-(5).  Given the

applicable residual functional capacity and vocational assessments, the ALJ concluded that

Mudd could work as a routing clerk/mail sorter, a flower picker, an inspector/packer, or a floor

worker.  R. at 20-21.  Heckman's testimony established that these jobs existed in the national

economy for purposes of 42 U.S.C. § 423(d)(2)(A).[6]  R. at 52.

## V.    Discussion

All of Mudd's arguments relate to the ALJ's residual functional capacity assessment and

corresponding hypothetical question to Heckman.  ECF No. 11 at 10-20.  Mudd contends that the

ALJ's residual functional capacity assessment was inconsistent with the documentary evidence

supplied by treating and examining sources.  *Id.* at 10-18.  This argument can only be understood

by reference to the specific medical evidence at issue.

Dr. Hai Wei Wang, a psychiatrist affiliated with Westmoreland Regional Hospital

("Westmoreland") in Greensburg, Pennsylvania, evaluated Mudd on June 5, 2006.  R. at 238-

242.  In a written report detailing the findings of the evaluation, Dr. Wang described Mudd's

"state of mood" as "depressed."  R. at 240.  The evaluation left Dr. Wang with the impression

that Mudd's depression would "last about a couple of years even with medication treatment."  R.

at 240.  Mudd's "unemployment" and "lack of social support" were described as the sources of

his "current social stress."  R. at 240.

Shortly after his evaluation with Dr. Wang, Mudd started to see Diane Muka ("Muka"),

who was a therapist affiliated with Westmoreland.  On June 19, 2006, Muka reported that Mudd

had been "tearful" throughout his first counseling session, and that his demeanor was attributable

---

[6] At the fifth step of the sequential evaluation process, "the Commissioner bears the burden of proving that, considering the claimant's residual functional capacity, age, education, and past work experience, [he or] she can perform work that exists in significant numbers in the regional or national economy."  *Boone v. Barnhart*, 353 F.3d 203, 205 (3d Cir. 2003).  This burden is commonly satisfied by means of vocational expert testimony.  *Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005).

to his "depression."  R. at 237.  One month later, Mudd was complaining of increased "fatigue" during the course of a typical day.  R. at 233.  Mudd informed Muka on August 9, 2006, that he had been "feeling the urge to destroy furniture," but that he had been able to resist that urge.  R. at 231.

On August 30, 2006, Mudd told Muka that a computed tomography ("CT") scan had revealed the existence of an enlarged lymph node on his chest.  R. at 231.  His preoccupation with that problem apparently caused him to have trouble sleeping.  R. at 229.  Mudd reported on September 13, 2006, that his wife had Crohn's disease, adding to his stress.  R. at 229.  Although he suffered from severe diarrhea in October 2006, that problem was quickly alleviated by an adjustment to his medication regimen.  R. at 225, 227.

Mudd's mental difficulties continued into 2007.  He told Muka on January 18, 2007, that his depression tended to worsen during the winter.  R. at 221.  On February 1, 2007, Mudd stated that he had been sleeping for only one to three hours per night.  R. at 221.  Nevertheless, he indicated on March 9, 2007, that an increase in the dosage of his Seroquel had allowed him to sleep better.  R. at 218.

On May 9, 2007, Dr. Daniel C. Marston conducted a consultative psychological evaluation of Mudd in connection with his application for disability insurance benefits.  R. at 246-254.  During the evaluation, Mudd stated that he was seeking Social Security disability benefits because of his "back problems."  R. at 247.  He further explained that his previous decision to quit his job had caused his depression to worsen.  R. at 247.  The record indicates that Mudd stopped working on October 24, 2001.  R. at 130.  He apparently quit his job as a store manager because of disagreements with his supervisor's son.  R. at 248-249.  While speaking with Dr. Marston, Mudd attributed his depression to his inability to work.  R. at 250.

8

In a written report detailing the findings of his evaluation, Dr. Marston explained:

> Mr. Mudd exhibited evidence of depressed mood and described symptoms of depression.  It seems that his depression interferes with his motivation to follow through on things he needs to do.  It was also my impression that his depressed mood seems to interfere with his motivation to put more effort into doing the things he needs to do.  I would also say that Mr. Mudd would likely have even more difficulties if he was in a stressful work environment.

R. at 251.  Dr. Marston reported that Mudd a "slight" degree of limitation in his abilities to understand, remember and carry out short, simple instructions, and to make judgments associated with simple work-related decisions.  R. at 253.  Mudd was found to have a "moderate" degree of limitation in his abilities to understand, remember and carry out detailed instructions, to respond appropriately to changes in a routine work setting, and to interact appropriately with supervisors, co-workers, and members of the general public.  R. at 253.  The only "marked" limitation identified by Dr. Marston pertained to Mudd's ability to respond appropriately to work pressures in a usual work setting.  R. at 253.  Dr. Marston stated that Mudd had a "fair prognosis for making some improvements in his mood" as long as he continued to "follow through consistently on his psychiatric and therapeutic treatments."  R. at 251.

Dr. Roger Glover, a nonexamining psychological consultant, opined on May 21, 2007, that Mudd had no "marked" limitations.  R. at 255-256.  Dr. Glover described Dr. Marston's examination report as an "overestimate of the severity" of Mudd's functional limitations.  R. at 257.  According to Dr. Glover, Mudd was "able to meet the basic mental demands of competitive work on a sustained basis."  R. at 257.  Richard Clohessy ("Clohessy"), a nonexamining medical consultant, indicated on June 28, 2007, that Mudd was physically capable of performing a full or wide range of "light" work activities.  R. at 154-159.

Mudd's application for disability insurance benefits was administratively denied on July 3, 2007.  R. at 61.  This denial apparently caused his mental condition to deteriorate.  On August 9, 2007, Mudd told Muka that he had remained on his couch for several days after learning that he would not be receiving benefits.  R. at 322.  According to Muka, the denial of Mudd's application "triggered a descent into extreme negativistic thinking."  R. at 322.  Mudd's wife urged him to seek legal counsel.  R. at 322.  By August 31, 2007, Mudd was mowing his lawn again.  R. at 322.  He evidently spent the first two weeks of September knocking down a shed with a sledgehammer and selling the remaining scrap metal for a profit.  R. at 321.

Muka reported on October 17, 2007, that Mudd had been "feeling more depressed and angry" after spending ten days in bed because of back pain.  R. at 319.  Nevertheless, Mudd was "keeping fairly busy" and "painting his porches" just two weeks later.  R. at 319.  Although he was "more active overall," Mudd indicated that he was "still feeling depressed."  R. at 319.

On November 15, 2007, Mudd claimed to have been hit with a "brick wall of depression."  R. at 318.  He informed Muka that he typically experienced his worst symptoms during the fall and winter months.  R. at 318.  Mudd was instructed to "stay active even when feeling depressed."  R. at 318.  He spent the ensuing Thanksgiving holiday with his wife's family.  R. at 316.  Although Mudd enjoyed the holiday, his interactions with other people apparently caused him to experience panic attacks.  R. at 316.

Mudd told Muka on December 20, 2007, that he was "feeling more energetic" and determined to have "a more positive Christmas."  R. at 315.  He stated that he had visited several stores in search of a Christmas present for his mother-in-law without experiencing anxiety-related symptoms.  R. at 315.  Muka remarked that Mudd was "much more productive" than he had been a few months earlier.  R. at 315.

Mudd cancelled his next counseling session due to illness.  R. at 315.  On February 21, 2008, he reported that his mental condition had taken a "drastic turn for the worst" two weeks after Christmas.  R. at 312.  According to Muka, Mudd was starting to "feel increasingly fatigued with decreased motivation and more trouble sleeping."  R. at 312.  He was "spending most of his time lying on the couch and not doing anything."  R. at 312.  He was no longer washing dishes or bathing on a regular basis.  R. at 312.  Mudd stated on April 9, 2008, that he had been feeling more depressed and had sometimes gone whole days without eating.  R. at 308.

Muka reported on October 31, 2008, that Mudd had missed two therapy appointments because of fatigue, and that he had left his house only four to five times during the previous two months.  R. at 340.  At that time, Mudd had a "decreased appetite," was "sleeping excessively" and experienced "facial twitching and some shaking in his hands."  R. at 340.  On December 4, 2008, Mudd informed Muka that he had suffered a "hypomanic episode" consisting of "an inability to sit still, pacing, insomnia, faster thoughts, and increased irritability."  R. at 344.  He described the experience as a "nervous breakdown" and indicated that he had considered admission for inpatient treatment.  R. at 344.

At the hearing, Mudd testified that he would have anxiety attacks whenever he was forced into "certain social situations."  R. at 36.  He stated that he usually avoided movie theaters, restaurants and stores because interactions with other people would often cause him to suffer panic attacks.  R. at 36.  Mudd described situations in which he had gone several days at a time without bathing and claimed that some of those incidents had predated the expiration of his insured status.  R. at 41-42.

The ALJ accorded "greater weight" to Dr. Glover's assessment than she did to Dr. Marston's assessment.  R. at 18-19.  Dr. Marston's findings were deemed to be more reflective

of Mudd's subjective complaints than they were of his actual functional abilities, while Dr.

Glover's opinion was deemed to be "more consistent with the medical evidence." R. at 18-19.

Nonetheless, the ALJ observed that her residual functional capacity assessment was generally

supported by Dr. Marston's examination findings in any event. R. at 19.

Mudd challenges only the ALJ's findings with respect to his mental limitations. ECF No.

11 at 10-20. He does not appear to take issue with the ALJ's findings concerning his physical

limitations. *Id.* Therefore, the Court's inquiry is limited to whether "substantial evidence"

supports the ALJ's conclusion that Mudd was mentally capable of maintaining a full-time job

during the period of time in question.

Mudd's alleged onset date is January 1, 2006. R. at 113. His insured status expired on

December 31, 2006. R. at 126. The relevant factual dispute centers on whether Mudd was

capable of engaging in substantial gainful activity in 2006. In support of his motion for

summary judgment, Mudd places extensive reliance on treatment records postdating the

expiration of his insured status. ECF No. 11 at 6-8, 19. These records are relevant to the

inquiry, but only to the extent that they shed light on Mudd's abilities and limitations in 2006.

*Reilly v. Office of Personnel Management*, 571 F.3d 1372, 1381-1382 (Fed.Cir. 2009); *Pollard v.

Halter*, 377 F.3d 183, 193-194 (2d Cir. 2004); *Ivy v. Sullivan*, 898 F.2d 1045, 1049 (5th Cir.

1990); *Smith v. Bowen*, 849 F.2d 1222, 1225-1226 (9th Cir. 1988); *Basinger v. Heckler*, 725 F.2d

1166, 1169 (8th Cir. 1984).

The crux of Mudd's argument is that Dr. Glover's consultative opinion was inconsistent

with the evidence provided by treating sources, and that the ALJ erred in according significant

weight to that opinion. ECF No. 11 at 10-20. This argument, however, begs the question.

Mudd's treating sources did not specifically assess his ability to engage in work-related

activities.  The burden was on Mudd to supply evidence establishing the existence of the

functional limitations that he alleges.  *Her v. Commissioner of Social Security*, 203 F.3d 388,

391-392 (6th Cir. 1999).  It is ordinarily inappropriate for an administrative law judge to credit

the opinion of a nonexamining medical consultant over that of a treating physician where the two

opinions are clearly in conflict.  *Brownawell v. Commissioner of Social Security*, 554 F.3d 352,

357 (3d Cir. 2008).  Nevertheless, in this case, the findings reported by Dr. Wang and Muka do

not necessarily contradict Dr. Glover's assessment.  This is especially true in light of the fact that

most of the treatment notes relied upon by Mudd postdated the expiration of his insured status.

A report provided by an examining source is usually entitled to more weight than a report

provided by a nonexamining source.  *McPherson v. Astrue*, 605 F.Supp.2d 744, 772 (S.D.W.Va.

2008).  Every medical report, however, must be regarded as competent evidence and weighed

accordingly.  *Williams v. Sullivan*, 970 F.2d 1178, 1185, n. 5 (3d Cir. 1992).  Where a report

supplied by a treating or examining source is "internally contradictory" or otherwise contradicted

by objective medical evidence, it can be rejected in favor of a report submitted by a

nonexamining source.  *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991).

The ALJ's residual functional capacity assessment properly accounted for all of the

"moderate" limitations found by Dr. Marston.  R. at 15, 253.  The only "marked" limitation

identified in Dr. Marston's examination report related to Mudd's ability to "[r]espond

appropriately to work pressures in a usual work setting."  R. at 253.  Unlike the more specific

"moderate" limitations described by Dr. Marston, the identification of this generalized "marked"

limitation appears to constitute nothing more than an opinion as to whether Mudd was statutorily

disabled.  The ultimate question of disability, of course, is reserved for the Commissioner's

determination.  *Wright v. Sullivan*, 900 F.2d 675, 683 (3d Cir. 1990).  Dr. Marston warned that

Mudd would experience more severe "symptoms of depression" if he were to be placed in a "stressful work environment." R. at 251.  As the Commissioner points out, however, the "work pressures" and "stress" experienced by an individual performing the duties of the positions identified by Heckman would not be "usual," since they would be significantly reduced by the more specific limitations described by Dr. Marston and incorporated within the ALJ's residual functional capacity assessment.  ECF No. 13 at 16.  For this reason, no clear conflict existed between the assessments provided by Dr. Glover and Dr. Marston.  To the extent that the opinions expressed by Dr. Glover and Dr. Marston were in conflict, it was not unreasonable for the ALJ to credit the opinion of Dr. Glover over that of Dr. Marston under the present circumstances.  *Jones*, 954 F.2d at 129.

Dr. Wang specifically described Mudd's "unemployment" and "lack of social support" as the reasons for his "current social stress."  R. at 240.  In his examination report, Dr. Marston suggested that Mudd's depression was largely attributable to the fact that he was unemployed. R. at 247.  Although Mudd stopped working on October 24, 2001, he alleges that his "disability" did not begin until January 1, 2006.  R. at 113, 126, 130.  He apparently told Dr. Marston that his depressive symptoms had dramatically increased after he had quit his job as a store manager.  R. at 247.  It would certainly be ironic if depression stemming directly from a claimant's failure or refusal to work were to be viewed as indicative of his or her inability to work.  In this respect, Mudd's attempt to impugn the ALJ's analysis is manifestly unpersuasive.

## VI.   <u>Conclusion</u>

In view of Mudd's failure to submit more compelling evidence of disability during the relevant period of time, the Court has no basis for setting aside the ALJ's decision.  Accordingly, the motion for summary judgment filed by Mudd (*ECF No. 10*) will be denied, the motion for

summary judgment filed by the Commissioner (*ECF No. 12*) will be granted, and the

Commissioner's decision denying Mudd's application for disability insurance benefits will be

affirmed.

Dated: September 29, 2011

_____

LISA PUPO LENIHAN
Chief United States Magistrate Judge

cc:    All counsel of record